IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHELLY J. CRAWFORD, | ) |
| Plaintiff, | ) Case No. 05 C 3205 |
| v. | ) Judge Virginia M. Kendall |
| WILMETTE PUBLIC SCHOOL DISTRICT 39, | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

Plaintiff Shelly J. Crawford ("Plaintiff") sued Wilmette Public School District 39 ("WPS") for unlawful discrimination and retaliation against her on the basis of her disability in violation of the Americans with Disability Act, 42 U.S.C. § 12111 *et seq.* and 42 U.S.C. § 1983. Specifically, Plaintiff alleged that WPS failed to accommodate her disability, and discharged her on the basis of her disability. Additionally, Plaintiff alleged that WPS retaliated against her by refusing to give her contract work after she filed her charges with the Equal Employment Opportunity Commission ("EEOC"). WPS now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because there is not genuine issue of material fact that Plaintiff knowingly and voluntarily released any claims against WPS, WPS' Motion for Summary Judgment is granted.

Statement of Facts

Plaintiff is a certified teacher with a college education and part of a master's education. Defendant's Statement of Material Facts (hereafter "Def. SOF") at ¶ 2. She is 56 years old and suffers from multiple sclerosis, which causes her to use a motorized scooter for ambulation. *Id.* Plaintiff began working for WPS in the 1994-95 school year as a substitute teacher. Plaintiff's

Response to Defendant's Statement of Material Facts (hereafter "Pltf. Resp. SOF") at ¶ 4, Crawford Dep. at 14. She worked as a special education paraprofessional during the 1995-96 school year, and then again as a substitute teacher for the 1996-98 school years. Plaintiff worked as an English as a Second Language paraprofessional at Ramona School (elementary education) for the 1998-2002 school years. She then worked as a building paraprofessional for the Romona School during the 2002-03 school year. Pltf. Resp. SOF at ¶ 4, Crawford Dep. at 14-17. During her years at Ramona, Plaintiff received excellent or satisfactory reviews from WPS personnel. Plaintiff's Statement of Additional Facts (hereafter "Pltf. SOF") at ¶ 1. While Plaintiff was at Ramona, she informed her supervisor that the new photocopying machines installed at the school were too tall for her to reach from her motorized scooter. After that, Plaintiff testified that it was arranged that she not photocopy any longer. Pltf. SOF at ¶ 2.

During the summer of 2003, WPS offered Plaintiff a position as a seventh-grade special education paraprofessional at the Wilmette Junior High School (the "Junior High"). Def. SOF at ¶ 5. Plaintiff worked in the paraprofessional position from the start of the 2003-04 school year until she signed a resignation agreement making her resignation effective April 26, 2004. Pltf. Resp. SOF at ¶ 6. While working at the Junior High, Plaintiff worked for a "team of teachers, including Alicia Flann ("Flann"), Steve Galligan ("Galligan"), Emily Mullin, Nancy Gustafson and Sara Marcucci. Def. SOF at ¶ 7. Flann was responsible for supervising Plaintiff's schedule and daily work. Pltf. Resp. SOF at ¶ 8. As a special education paraprofessional, Plaintiff's responsibilities included accompanying students to each regular education classroom, and assisting them with materials, organization, schedules, and assignments. Plaintiff's responsibilities did not include toilet, wash-up, or dressing duties for the special education students. Pltf. Resp. SOF at ¶ 9. The teachers also

2

assigned Plaintiff photocopying; the parties dispute the extent of photocopying that was required of a special education paraprofessional. Pltf. Resp. SOF at ¶ 9, Defendant's Response to Plaintiff's Statement of Additional Material Facts (hereafter "Def. Resp. SOF") at ¶ 5.

*Meetings Concerning Plaintiff's Performance*

The employees of WPS on Plaintiff's team testified that they observed problems with Plaintiff's performance - such as inappropriate socialization with the students, failure to follow the teacher's lead, and wrong direction to students - starting in the fall of 2003. Plaintiff denies that she committed any of the problematic acts. Pltf. Resp. SOF at ¶ 10. The Junior High assistant principal, Steven Smith ("Smith") instructed Flann to speak with Plaintiff about the concerns and compile documentation of the problems. Pltf. Resp. SOF at ¶ 11. On October 31, 2003, Plaintiff met with the director of the special education program, Raymond Lechner ("Lechner") regarding both Plaintiff's performance problems and an incident involving a parent in the school parking lot. Pltf. Resp. SOF at ¶ 12-15. Plaintiff admits that the meeting took place and was attended by Lechner, Smith, and teacher's union representative Lisa Winter ("Winter"), but denies the truth of any of the allegations set forth at the meeting. Pltf. Resp. SOF at ¶ 13-14. Plaintiff admits that the memorandum of the October 31, 2003 meeting, dated November 5, 2003, accurately reflects the discussion at the October 31, 2003 meeting about the school parking lot incident. Pltf. Resp. SOF at ¶ 15, Ex. J. Plaintiff also admits that Smith told her about the poor performance reports from the teachers with whom Plaintiff worked, although she denies the truth of the reports. Pltf. Resp. SOF at ¶ 16. Plaintiff told Smith that she would try to improve her performance. Def. SOF at ¶ 17. Plaintiff also claims that she told Smith, Lechner, and Winter at the October 31, 2003 meeting that

3

she could not see the top of the photocopier because it was too tall, but does not remember their response. Pltf. Resp. SOF at ¶ 18.

Plaintiff received a memorandum addressed to her dated November 5, 2003, summarizing the October 31, 2003 meeting as it related to her performance evaluation, and containing suggestions about how to improve her performance. Pltf. Resp. SOF at ¶ 19. Plaintiff does not believe that the memorandum accurately summarized the performance discussion at the meeting, because it does not describe her concerns about photocopying. *Id.*

On December 18, 2003, Plaintiff met with the Director of the Human Resources Department, Alice Reardon ("Reardon"), Smith, and Winter regarding ongoing performance concerns. Plaintiff admits the meeting occurred, but denies the truth of the allegations about her poor performance. Pltf. Resp. SOF at ¶ 20. Plaintiff was informed that the teachers were reporting that Plaintiff gave incorrect information to students, did work for the students instead of assisting them, and distracted the students. Pltf. Resp. SOF at ¶ 22. Plaintiff denies that these reports are accurate. Pltf. SOF at ¶ 12-14. Plaintiff was also informed that teachers Flann and Galligan reported problems with Plaintiff's photocopying, including poor or inaccurate copies. Pltf. Resp. SOF at ¶ 23. At the meeting, Plaintiff responded that she had photocopied in a hurry and that the machine had broken down. Pltf. Resp. SOF at ¶ 24, Pltf. SOF at ¶ 14.. Plaintiff told Smith either at this meeting or a subsequent meeting that she could not see the photocopier, to which Smith responded "there are times where the photocopying is accurate, so . . . there are times when you can do it." Pltf. SOF at ¶ 10, Smith Dep. at 65-67. Smith also asked her what he could do to help her perform better, to which she responded that she would like to clarify the teachers' expectations. Def. Resp. SOF at ¶ 10, Smith Dep. at 66.

At the December 18, 2003 meeting, Plaintiff was informed that her current level of performance was not satisfactory, and that she needed to improve in order to remain in her position. Pltf. Resp. SOF at ¶ 26, Ex. O. Plaintiff was provided with a memo dated December 15, 2003 detailing the performance concerns of WPS - the truth of which Plaintiff disputes - that listed nine separate performance complaints, three of which pertain to photocopying. Pltf. SOF at ¶ 16. Plaintiff also received a memo dated December 22, 2003 summarizing the discussion at the meeting, offering suggestions to improve performance, and warning about the need for improvement. Pltf. Resp. SOF at ¶ 25, 27, Ex. O. Plaintiff admits receiving both memoranda, and agrees that the December 22, 2003 memorandum summarized the discussion at the meeting, but disputes that she had the performance problems alleged. Pltf. Resp. SOF at ¶ 27.

After the December 18, 2003 meeting, Plaintiff began meeting daily with Flann about performance concerns. Plaintiff denies that she had any performance problems, but agrees that she had daily meetings with Flann. Pltf. Resp. SOF at ¶ 29. Flann testified that Plaintiff's performance did not improve. Flann Dep. at 26-27. Also following the December 18, 2003 meeting, Plaintiff's teachers compiled a list of job expectations for Plaintiff's review. Pltf. Resp. SOF at ¶ 30. Plaintiff discussed the job expectations with Smith on January 16, 2004; one of the listed expectations involved accurate photocopying. Pltf. Resp. SOF at ¶ 31. Plaintiff told Smith that she "would do her best." *Id.* Plaintiff claims that photocopying was the only real performance issue she had. Pltf. Resp. SOF at ¶ 32.

On March 25, 2004, Plaintiff met again with Reardon and Smith, with Winter in attendance. Pltf. Resp. SOF at ¶ 33. As with the October 31, 2003 and December 18, 2003 meetings, WPS provided Plaintiff with a memorandum setting forth the performance concerns that prompted the

5

meeting; after the meeting, WPS provided Plaintiff with a second memorandum summarizing the discussion at the meeting as well as the job expectations. Pltf. Resp. SOF at ¶ 34, 40. The memorandum setting forth the performance concerns listed twelve instances of performance complaints, six of which related to photocopying. Pltf. SOF at ¶ 20. At the March 25, 2004 meeting, Smith discussed reports about Plaintiff's performance concerning her interaction with the students, providing guidance to students rather than answers, accurate photocopying, and professional judgment. Pltf. Resp. SOF at ¶ 36. Plaintiff denies that she had any performance concerns other than photocopying issues. *Id.*, Pltf. SOF at ¶¶ 17-19. Plaintiff might have told Smith and Reardon at the March 24, 2004 meeting that she could not see the top of the photocopier. Crawford Dep. at 80. At the meeting, Smith and Reardon both informed Plaintiff that she could not continue in her position if her performance remained unsatisfactory, but that substitute teaching was an option for Plaintiff. Pltf. Resp. SOF at ¶ 36. Plaintiff did not suggest alternatives to being a special education paraprofessional. *Id.* Plaintiff was given several days to consider her options. Pltf. Resp. SOF at ¶ 38.

On March 30, 2004, Plaintiff told Reardon that she wanted to remain a special education paraprofessional, and that she understood that she would be terminated if she did not improve her performance. Pltf. Resp. SOF at ¶ 39. On April 19, 2004, after further concerns from teachers, Smith told Reardon that the teachers reported Plaintiff inappropriately looked through a test booklet, inappropriately talked to students, required teacher directions to be repeated, and failed to give one of the teachers items left by a parent. Pltf. Resp. SOF at ¶ 41. Plaintiff denies these allegations. *Id.* On April 20, 2004, Smith gave a memorandum to Plaintiff notifying her that there would be a meeting on April 26, 2004 to "discuss continuing concerns" about Plaintiff's performance. Pltf.

Resp. SOF at ¶ 42. Reardon informed Winter that Plaintiff would be terminated. Reardon Dep. at 173-4.

*The Resignation Agreement*

The District prepared a written resignation agreement (the "Agreement") in which Plaintiff received $700 of flexible spending in her account, payment of her unused sick days, and a positive written recommendation in exchange for her resignation from her position as a special education paraprofessional at the Junior High. (Reardon Dep. at 173-78.) The Agreement also provided that Plaintiff would release any claims that she had against WPS, including claims brought under the ADA. Pltf. Resp. SOF at ¶ 47.

On April 26, 2004, Reardon met with Plaintiff and Winter to discuss the Agreement. Reardon presented the Agreement to Plaintiff, but the parties dispute whether Reardon discussed the terms with her. Pltf. Resp. SOF at ¶ 45. Reardon gave Plaintiff twenty-one days to review the Agreement; Plaintiff told Reardon that she "wanted her attorney to look at it." Pltf. Resp. SOF at ¶ 48. Plaintiff read the Agreement "one, maybe two times" before she signed it and reviewed the terms of the agreement "to the best that [she] understood them." Pltf. Resp. SOF at ¶ 51. She did not make any changes to the Agreement before she signed it, nor did she ask anyone at WPS whether she could make any changes to it. Pltf. Resp. SOF at ¶ 52. Prior to the meeting with Reardon and Winter, Plaintiff talked with Winter about at least some of the terms that would be included in Agreement. Pltf. Resp. SOF at ¶ 53, 56. Plaintiff also testified that she discussed the Agreement's legality with an attorney, but she did not show the attorney the Agreement. Crawford Dep. at 97-98. Plaintiff signed the Agreement on May 20, 2004. Pltf. Resp. SOF at ¶ 54. WPS gave Plaintiff seven days to revoke the Agreement, but she did not do so. Pltf. Resp. SOF at ¶ 55.

7

*Subsequent Employment with WPS*

Following Plaintiff's resignation, Plaintiff served as a substitute teacher in the 2004-2006 school years. Pltf. Resp. SOF at ¶ 74. Smith placed Plaintiff on a "do not call" list for substitutes at the Junior High because he believed that if she could not perform adequately as a special education paraprofessional, she would not be able to perform adequately as a substitute teacher. Pltf. Resp. SOF at ¶ 77. During the 2004-05 school year, Plaintiff substituted three times. Pltf. Resp. SOF at ¶ 78. She may have declined to substitute once or twice because of a personal obligation. Pltf. Resp. SOF at ¶ 78. During the 2005-06 school year, WPS changed to an electronic substitute teaching program, after which Plaintiff substituted more than twenty times. Pltf. Resp. SOF at ¶ 79.

<u>Standard of Review</u>

Summary judgment is correct when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The Court must construe all facts in a light most favorable to the non-moving party and view all reasonable inferences in the non-moving party's favor to determine if a genuine issue of a material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A material fact is one that is outcome-determinative under governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). In analyzing the facts for the purposes of a summary judgment, the Court will "limit its analysis of the facts…to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). But a party must do more than rely on unsubstantiated facts to defeat summary judgment. *Greer v. Bd. of Educ. of the City of Chi.*, 267 F.3d 723, 729 (7th Cir. 2001). Parties must cite to

specific support in the record. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).The ADA safeguards "qualified individuals with a disability from discrimination in their employment, hiring process, or promotions." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380 (7th Cir. 2005); 42 U.S.C. § 12112(a).

Discussion

*The Waiver Agreement*

Plaintiff signed a resignation agreement with WPS in which Plaintiff received benefits from WPS and in which Plaintiff agreed to release any claims she had against WPS, including claims brought under the ADA. A plaintiff may waive federal statutory rights via a release agreement if the plaintiff entered the release agreement knowingly and voluntarily. *See Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 570 (7th Cir. 1995) (*Pierce I*); *aff'd* 110 F.3d 431 (7th Cir. 1997) (*Pierce II*); *accord Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368 (7th Cir. 1989). The federal policy underlying the knowing and voluntary release is "the encouragement of voluntary settlement of claims." *Pierce I*, 65 F.3d at 572. Although the ultimate burden to show knowledge and voluntariness rests with the defendant, once a defendant raises the existence of a waiver of claims, the burden shifts to the plaintiff to produce specific evidence raising a question that the waiver was not voluntary, in addition to any affirmative defense such as fraud or duress. *Id.*; *aff'd and explained by Pierce II*, 110 F.3d at 437-438.

When a plaintiff challenges the voluntariness of the agreement, courts apply a "totality of the circumstances" test to determine whether the plaintiff entered the agreement knowingly and voluntarily, even if the language of the agreement is unambiguous. *Pierce I,* 65 F.3d at 571. In considering the totality of the circumstances, courts consider: (1) the employee's education and

9

experience; (2) the employee's input in negotiating the terms of the agreement; (3) the agreement's clarity; (4) the amount of time given to the employee for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms prior to signature; (6) whether the employee consulted with an attorney before signing the agreement; (7) whether the employee received benefits in exchange for the waiver that exceeded the benefits to which the employee was entitled by law or by contract; and (8) whether the employee's release was induced by the defendant's improper conduct. *See id.*

In this case, Plaintiff has not raised specific evidence sufficient to create a genuine issue of material fact that Plaintiff did not sign the release knowingly and voluntarily. Under the totality of the circumstances test, factors one, three, and four are undisputed and weigh in favor of WPS. Plaintiff has a college degree and part of a masters' degree. *See Kinney v. Hamilton Partners*, 2004 WL 765882 at *7 (N.D. Ill. Apr. 7, 2004) (finding that a plaintiff's GED and fifteen years of work experience favor defendant in totality of circumstances test); *see also Nobles v. Discover Financial Services, Inc.*, 2003 WL 22326584 at *2, 4 (N.D. Ill. Oct. 9, 2003) (genuine issue of fact where plaintiff was a high school dropout and claimed the release "used many terms that he did not understand"). Plaintiff does not dispute that the terms of the release provision in the Agreement were clear, set forth in a separate paragraph, and titled "General Release of Claims."[1] Plaintiff also

---

[1] **General Release of Claims:** In consideration of the promises contained herein, the Employee and her heirs, agents, representatives and assigns, and the Union and its officers, agents, administrators, employees, insurers, heirs, successors and assigns, hereby release, discharge, and forever free the School District and the Board and their respective officer, agent, administrators, employees, insurers, heirs, successor and assigns, and each and every one of them, of and from any and all claims, debts, dues, demands, liens, obligations, fees (including attorneys' fees), actions or causes of action, of every kind or nature, at law or in equity, which the Employee or the Union may now have or claim to have or which may hereinafter accrue, whether known or unknown, anticipated or unanticipated, against the School District and the Board and

does not dispute that she received twenty-one days to consider the Agreement before she signed it, and that WPS provided her with an additional seven days to revoke her consent after she signed the Agreement. Pltf. Resp. SOF at ¶¶ 48, 55; *see also Kinney*, 2004 WL 765882 at *8 (finding that factor of time favored defendant when plaintiff had twenty-one days to consider the terms of the agreement and seven days to revoke consent).

Plaintiff admits that she read the Agreement and the release provision before signing the Agreement. Plaintiff asserts that she read the Agreement "once, maybe twice" before signing. As in *Kinney*, the amount of time that Plaintiff received to review the Agreement - twenty-one days prior to signature, and seven days in which to revoke consent - indicate that any failure to read the Agreement carefully is a reflection of Plaintiff's lack of intention to do so. *See Kinney*, 2004 WL 765882 at *8. Plaintiff offered no evidence that she "did not have time to read the agreement, was not afforded an opportunity to read the agreement, or received advice that he should not or need not read the agreement." *Id., citing Pierce I*, 65 F.3d at 572.

Plaintiff also received consideration for signing the Agreement. Courts also consider the terms of the agreement containing the release provision to determine whether the plaintiff received

---

its respective officers, agents, administrators, employee, insurers, heirs, successors and assigns, and each and every one of them, by reason of any act done or omitted to be done connected with the past or present relationship between the parties arising out of the Employee's employment with the Board, except as contemplated by this Agreement. This release specifically includes, but is not limited to, rights or claims arising under the *Illinois School Code,* the *Illinois Human Rights Act*, Title VII of the *Civil Rights Act of 1964*, the *Age Discrimination in Employment Act of 1967*, as amended the *Americans With Disabilities Act of 1990*, and Section 504 of *The Rehabilitation Act of 1973*, and any other applicable federal, state, or local statute, ordinance, or regulation or any collective bargaining agreement. By this waiver, the Employee does not waive rights or claims arising under the *Age Discrimination Employment Act of 1967*, as amended that may arise after the date this waiver is executed.
Ex. V. at ¶ 6 (emphasis in original).

any consideration for the release beyond the consideration to which the plaintiff was otherwise entitled by contract or by law. *See Pierce I*, 65 F.3d at 570. Plaintiff focuses upon the paid sick leave and the $700 flexible spending money for health care and argues that there exists a genuine issue as to whether she was already entitled to those monies by law or contract. *See* Pltf. Mem. Opp. at 7. But Reardon testified that employees who leave voluntarily before the end of the school year are not entitled to payment of either their sick leave or their flexible spending money for health care. Reardon Aff., Ex. NN. Additionally, Plaintiff received a substantial benefit that no one argues was a legal or contractual entitlement: she received a favorable letter of recommendation from WPS in spite of the history of complaints about Plaintiff's performance that lead WPS to determine that termination was necessary. Crawford Dep. at 110; Sample Letter of Recommendation, Ex. KK.

The parties dispute whether Plaintiff had input into the terms of the Agreement. Reardon testified that Plaintiff had input, while Plaintiff and Winter testified that Reardon proposed the terms. Winter testified that Plaintiff specified that all of the terms favorable to her be placed in writing. Pltf. SOF at ¶ 24. Taking the facts in the light most favorable to Plaintiff, this factor weighs in Plaintiff's favor that she had at most minimal input into the terms of the Agreement.

The parties dispute whether Plaintiff consulted with an attorney prior to signing the Agreement, but the evidence in the record favors WPS. An employee who executes a release under the advice of counsel is assumed to have knowingly and voluntarily entered into the release, absent evidence of fraud or duress. *See Riley*, 881 F.2d at 373. At the April 26, 2004 meeting, at which time Plaintiff received the Agreement, Plaintiff stated to Reardon that she wanted to show the Agreement to an attorney before she signed it. Crawford Dep., Ex. A at 98. Plaintiff also admitted that she talked with an attorney about the Agreement, although she did not show it to him. Crawford

12

Dep., Ex. A. at 96-98. Finally, the Agreement itself states that, by signature, "the Employee acknowledges that she has been advised to consult with an attorney prior to executing this Agreement." Resignation Agreement, Ex. V ¶ 9; *see Howell v. Motorola, Inc.*, 2005 WL 2420410 (N.D. Ill. Sept. 30, 2005) (employee could not claim that the release was not voluntary when waiver agreement recommended he consult with an attorney but he declined to do so).

Finally, Plaintiff's signature to the Agreement was not achieved through improper conduct on the part of WPS. To determine whether there was improper conduct, the Court "looks to whether defendants engaged in improper conduct designed to induce [the employee] to sign the [resignation agreement] rather than the underlying acts which caused the agreement to be formulated in the first place." *Meyers v. TruGreen, Inc.*, 2004 WL 1146120 at *6 (N.D. Ill. May 21, 2004). Plaintiff argues that WPS improperly promised Plaintiff that she would be able to substitute teach in the district if she signed the agreement, and then failed to offer Plaintiff substitute teaching positions. But while Plaintiff argues that she did not receive as much substitute teaching as she would have liked, she admitted that she taught summer school in 2004, received some substitute teaching work in WPS in 2004-2005, and then received substantially more work in 2005-2006 when WPS moved to an electronic system for substitute teaching applications. *Compare* 2004-2005 substitute teaching list, Ex. GG, 2005-2006 substitute teaching list, Ex. MM.

Viewing Plaintiff's conduct in light of the totality of the circumstances, Plaintiff has not come forward with specific facts that raise a genuine issue of material fact about the voluntariness of her decision to sign the Agreement. Plaintiff is an educated woman with work experience, who read the Agreement and discussed its legality with an attorney. Plaintiff may not have had input into the terms of the Agreement, but the consideration she received exceeded that to which she was

13

entitled by contract or law. WPS gave Plaintiff twenty-one days to review the Agreement; after she signed, she received another seven days in which to revoke her consent but did not do so. Without specific facts showing that the release may not have been voluntary, the existence of a valid waiver barring Plaintiff's claims warrants summary judgment in WPS' favor.

*Duress*

Plaintiff raises the issue of duress in regard to her decision to sign the Agreement. Duress is a defense to an otherwise valid contract. *Pierce I*, 65 F.3d at 569. Duress is "the taking of undue advantage of the business or financial stress or extreme necessities or weaknesses of another." *Id.* It is not placing a person in "a difficult bargaining position or the pressure of financial circumstance." *Id.* As with the discussion of the totality of the circumstances above, Plaintiff does not raise a genuine issue of material fact that she signed the Agreement under duress. Plaintiff's only argument with respect to duress is that a threat of discharge from employment, alone, is enough to void a resignation agreement. *See Meyers*, 2004 WL 1146120 at *6. While Plaintiff may have felt financial pressure that she would be terminated if she did not sign the Agreement, that alone does not negate undisputed facts that she received substantial time to review the Agreement, could revoke her consent if she chose, could speak with an attorney about the Agreement, and admitted that she read the Agreement before she signed it. Plaintiff has not presented facts to support that the Agreement was fraudulently induced or that WPS took advantage of extreme necessities or weaknesses of Plaintiff.

Conclusion

Because Plaintiff has not presented sufficient facts to create a material issue regarding her waiver of claims against WPS, the Court does not need to reach Defendant's alternative grounds for summary judgment. WPS' Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: January 25, 2007